# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LABORERS' INTERNATIONAL UNION OF NORTH AMERICA NATIONAL (INDUSTRIAL) PENSION FUND, Derivatively on Behalf of Nominal Defendant STAPLES, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>THOMAS G. STEMBERG, MARTIN E. HANAKA, JOHN B. WILSON, LOUIS R. PEPI, JOSEPH S. VASSALLUZZO, RONALD L. SARGENT, PATRICK HICKEY, JOHN J. MAHONEY, SUSAN S. HOYT, JOHN C. BINGLEMAN, ROBERT K. MAYERSON, JEFFREY E. NACHBOR, BASIL L. ANDERSON, BRENDA C. BARNES, ARTHUR M. BLANK, MARY ELIZABETH BURTON, ROWLAND T. MORIARTY, ROBERT C. NAKASONE, MARTIN TRUST AND PAUL F. WALSH, )<br><br>Defendants, )<br><br>and )<br><br>STAPLES, INC., )<br><br>Nominal Defendant. ) | No. _____<br><br>**SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Laborers' International Union of North America National (Industrial) Pension Fund ("LIUNA"), by its undersigned attorneys, submits this Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal Defendant Staples, Inc. ("Staples" or the "Company") against certain members of its Board of Directors and certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

2.      This action stems from a widening scandal involving more than 140 investigations being conducted by the United States Securities and Exchange Commission ("SEC") and/or the United States Department of Justice ("DOJ") into the evident backdating of stock option grants to corporate executives.

3.      During a period ranging from at least 1994 through 2006, the Individual Defendants (as defined herein), in gross breach of their fiduciary duties as officers and/or directors of Staples, colluded with one another to:

    a.      improperly backdate grants of Staples stock options to former Staples Chief Executive Officer Thomas G. Stemberg, current Staples Chief Executive Officer Ronald L. Sargent and other Staples executives and board members, in violation of the Company's shareholder-approved stock option plans;

    b.      improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles (GAAP);

    c.      improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Tax Code;

    d.      produce and disseminate to Staples shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    e.      improperly exercise or permit the exercise of previously backdated options.

4.      In mid-2002, Congress passed the Sarbanes-Oxley Act, requiring that stock options be reported to the SEC within two days of their being granted – a requirement that is and was intended to be wholly consonant with the time honored principle that shareholders have a

right to full, complete and accurate information regarding executive compensation.  However, the practice of repeatedly and consciously backdating stock options granted to Staples executives, including former CEO Stemberg and current CEO Sargent, and Board members remained concealed from the public and its shareholders.  To that end, the Defendants caused Staples to file false and misleading statements with the SEC, including proxy statements, which stated that the options granted by Staples carried with them an exercise price that was not less than the fair market value of Staples stock on the date of the grant.

5.      To achieve the Company's stated goal of strengthening the Company's ability to attract and retain key employees who are expected to contribute to the Company's growth and success, Staple's shareholder-approved stock option plans provide that the exercise price of a stock option cannot be "less than the fair market value of the common stock on the date of grant or at an exercise price not less than 110% of the fair market value in the case of incentive stock options granted to optionees holding more than 10% of the voting power of Staples." However, the Individual Defendants blatantly violated this and other provisions of the Company's stock option plans by backdating Staples stock options in order to illegally maximize the grantees' profits. As such, and as detailed below, the Individual Defendant's acts were unauthorized and beyond the scope of the authority granted to them.

6.      To paraphrase from two popular marketing campaigns – one that ran several years ago, and one that is currently being run by Staples – when Staples executives and directors wanted more from their options, and didn't care if they got it at the expense of the Company, they simply backdated stock options so that the exercise prices would be less than the fair market value of the stock on the date the grants were actually approved.  When asked to authorize such

misconduct, Staples Board members said:   "*Yeah.   We can do that*," to which the Staples

executives said: "*That was easy*."

7.      On November 14, 2006, Staples revealed that the Company conducted a review of

its historical stock option granting practices during the period of 1997 to the present which

found, among other things, that the Company had actually issued stock options on dates other

than the purported grant dates, and that the Company needed to take a charge in the third quarter

2006 "due to the use of incorrect measurement dates."

8.      At bottom, Defendants' practice of backdating stock options constitutes a clear

breach of their fiduciary duties and abuse of control which has caused immeasurable damage to

Staples and for which they are liable.  As former SEC Chairman Arthur Levitt was quoted as

stating in a recent article published in the *Wall Street Journal,* stock option backdating

"represents the ultimate in greed."   Further, Former Chairman Levitt stated "it is stealing, in

effect.  It is ripping off shareholders in an unconscionable way."

9.      Harvey Pitt, the former chairman of the SEC from 2001-2003, weighed in on the

developing backdating scandal in a May 26, 2006 article he authored for *Forbes.com* entitled

"The Next Big Scandal."   He opined that backdating options grants constitutes fiduciary

misconduct, remarking that "[f]or one thing, it likely renders a company's proxy materials false

and misleading."   Pitt continued: "Securities law violations are not the only potential problems

with backdating options grants.  Backdating may violate the Internal Revenue Code…."   He

added that on the state level, "backdating could involve a breach of fiduciary duty, a waste of

corporate assets and even a usurpation of corporate opportunity."   More fundamentally, Pitt

explained, "the financial statements of a company that has engaged in backdating may require

restatement.  The options may not be deductible, and the expenses, as well as the various periods

to which they may have been allocated, may also be incorrect.  These factors would require a restatement, with class action litigation in the offing."

10.     Investigations by United States government have resulted in several former corporate executive in another company pleading guilty in federal court to charges relating to stock options backdating.  Other corporate executives have been forced to step down.  And, it was reported that one former CEO has fled the country while secreting tens of millions of dollars in Middle East bank accounts.  An analysis by institutional shareholder advisory firm Glass Lewis estimates that the stock options backdating scandal has cost companies nationwide approximately $10.3 billion.

11.     The scandalous nature of these activities cannot be over emphasized.  On May 5, 2006, President George W. Bush stated in an interview that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."  Senator Paul S. Sarbanes stated at a U.S. Senate Committee hearing on stock options backdating on September 6, 2006 that "investors will begin to question the integrity of the U.S. capital markets."  Adding, as an overarching concern and truth, that America's capital markets' "reputation for integrity has been an important economic asset for the Nation."

12.     The United States Senate has decried the greed and exploitation of shareholders, including Senator Chuck Grassley who stated recently with regard to stock options backdating:

> It is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an "honest day's work for an honest day's pay" and replaces it with a phrase that we hear all too often today, "I'm going to get mine."  Even worse in this situation, most of the perpetrators had already gotten "theirs" in the form of six-and seven-figure compensation packages of which most working Americans can only dream.  But apparently that was not enough for some.  Instead, *shareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called "back-dating"* – to further enrich themselves.  And as we have found far too often in corporate scandals of recent years, boards of

directors were either asleep at the switch, or in some cases, willing accomplices themselves.  (Emphasis added).

13.    As more fully alleged below, the Board of Directors of Staples colluded with Staples executives to commit, foster and conceal an ongoing practice between 1994 and 2006 of the backdating of stock options while permitting the continuing exercise of vested backdated options by corporate executives and directors, including former CEO Stemberg and current CEO Sargent.  In these circumstances, as more fully set forth below, making a demand on the Board would be futile and required to be excused.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 because of claims arising under federal law.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") and 28 U.S.C. §1391(a)(1) because one or more of Defendants either resides or maintains executive offices in this Judicial District, and a substantial portion of the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District.  Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## PARTIES

### Plaintiff

16.     Plaintiff LIUNA is, and was during the relevant period, a shareholder of nominal Defendant Staples.

### Nominal Defendant

17.     Nominal Defendant Staples is a Delaware corporation with its principal executive offices located at Five Hundred Staples Drive, Framingham, Massachusetts 01702.  According to its public filings, Staples is the world's leading office products company.

### Officer Defendants

18.     Defendant Thomas G. Stemberg ("Stemberg") founded the Company and has served as the Company's Chairman Emeritus of the Board since March 2005. Stemberg served as the Chairman of the Board from February 1998 to March 2005, as a Non-Executive Chairman from February 2004 to March 2005, as Executive Chairman from February 2002 to January 2004, and as Chief Executive Officer from January 1986 to February 2002.  Because of Stemberg's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Stemberg received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Stemberg engineered, received or otherwise obtained backdated stock options and illegal compensation

from Staples that was not disclosed to the Company's shareholders.  Staples paid Stemberg the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|---|---|---|---|---|---|---|
| Stemberg | 2003 | $1,000,000 | $1,354,666 | $7,870,000 | 350,000 | $47,213 |
| | 2002 | $852,500 | $1,034,797 | $7,363,900 | 350,000 | $127,123 |
| | 2001 | $728,533 | $182,198 | $1,365,000 | 350,000 | $29,978 |
| | 2000 | $710,117 | $243,624 | $1,418,750 | 600,000 | $30,252 |
| | 1999 | $682,083 | $525,147 | $2,075,000 | 300,000 | $22,844 |
| | 1998 | $645,833 | $673,556 | $2,606,250 | 2,400,000 | $17,769 |
| | 1997 | $587,500 | $446,172 | $1,543,434 | 240,000 | $3,620 |
| | 1996 | $447,917 | $414,315 | $1,216,875 | 160,000 | - |
| | 1995 | $422,916 | $280,730 | - | 213,750 | - |
| | 1994 | $349,167 | $300,888 | - | 213,750 | $1,324 |

Included in Stemberg's compensation were the grants or awards of stock options as alleged in ¶ 81 below.  Defendant Stemberg engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

19.     Defendant Martin E. Hanaka ("Hanaka") served as the Company's President and Chief Operating Officer from August 1994 to October 1997, and as a Director from May 1996 to October 1997.  Because of Hanaka's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Hanaka received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff

alleges that Hanaka engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders. Staples paid Hanaka the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|------------------------------------------------|------------------------|
| Hanaka | 1996 | $420,833 | $313,038 | $1,106,250 | 210,000 | - |
|  | 1995 | $372,916 | $198,162 | - | 150,000 | - |
|  | 1994 | $163,333 | $241,175 | - | 162,499 | - |

Included in Hanaka's compensation were the grants or awards of stock options as alleged in ¶ 81 below.

20.    Defendant John B. Wilson ("Wilson") served as the Company's Executive Vice President – Finance & Strategy and Chief Financial Officer from November 1992 to 2000. Because of Wilson's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Wilson received options that were dated at or very close to the lowest stock price for the period during which options were granted. Accordingly, on information and belief, plaintiff alleges that Wilson engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders. Staples paid Wilson the following compensation during the years 1994 and 1995:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|-------------------------------------------------|------------------------|
| Wilson | 1995 | $333,333 | $162,273 | - | 58,500 | - |
|        | 1994 | $282,083 | $192,053 | - | 58,500 | $76,682 |

Included in Wilson's compensation were the grants or awards of stock options as alleged in ¶ 81 below.

21.     Defendant Louis R. Pepi ("Pepi") served as the Company's Executive Vice President- Human Resources from August 1994 to in or about May 1995, as President of the "Staples, The Office Superstores" division from April 1993 to August 1994, and as Executive Vice President – Operations from October 1990 to April 1993.  Because of Pepi's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Pepi received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Pepi engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders. Staples paid Pepi the following compensation in 1994:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|---|---|---|---|---|---|---|
| Pepi | 1994 | $259,167 | $116,493 | - | 37,500 | - |

Included in Pepi's compensation were the grants or awards of stock options as alleged in ¶ 81 below.

22.     Defendant Joseph S. Vassalluzzo ("Vassalluzzo") served as the Company's Vice Chairman from December 1999 to in or about 2004 and in various other capacities since he joined the Company in September 1989, including President, Realty and Development from October 1997 to December 1999, as President – Staples Realty from September 1996 to October 1997, as Executive Vice President – Growth and Development from November 1993 to September 1996, and as Executive Vice President – Growth and Support Services from April 1993 to November 1993.  Because of Vassalluzzo's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Vassalluzzo received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Vassalluzzo engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders.  Staples paid Vassalluzzo the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|---|---|---|---|---|---|---|
| Vassalluzzo | 2003 | $537,158 | $436,742 | $1,172,700 | 100,000 | $17,742 |
| | 2002 | $518,333 | $376,741 | $609,705 | 100,000 | $85,310 |
| | 2001 | $498,633 | $74,831 | $614,250 | 100,000 | $17,750 |
| | 2000 | $482,050 | $121,278 | $638,437 | 400,000 | $5,523 |
| | 1999 | $463,000 | $261,413 | $933,750 | 90,000 | $46,947 |
| | 1998 | $439,250 | $325,636 | $1,064,202 | 585,000 | $48,150 |
| | 1997 | $391,250 | $198,007 | $776,394 | 146,875 | $1,484 |
| | 1996 | $312,500 | $193,347 | $553,125 | 70,000 | - |
| | 1995 | $283,333 | $125,503 | - | 37,500 | - |
| | 1994 | $247,083 | $186,849 | - | 37,500 | $1,086 |

Included in Vassalluzzo's compensation were the grants or awards of stock options as alleged in ¶ 81 below.  Defendant Vassalluzzo engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

23.     Defendant Ronald L. Sargent ("Sargent") has served as the Company's Chief Executive Officer since February 2002, as Chairman of the Board since March 2005 and as a Director since December 1999.  Sargent served as the Company's President from November 1998 to March 2005, as Chief Operating Officer from November 1998 to February 2002, as President – North American Operations from October 1997 to November 1998, as President – Staples Contract & Commercial from June 1994 to October 1997, and in various other capacities since joining the Company in March 1989.  Because of Sargent's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Sargent received options that were dated at or very

close to the lowest stock price for the period during which options were granted. Accordingly, on information and belief, plaintiff alleges that Sargent engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders. Staples has paid Sargent the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|------------------------------------------------|------------------------|
| Sargent | 2005 | $1,033,000 | $1,326,481 | $3,258,000 | 525,000 | $259,542 |
| | 2004 | $1,000,000 | $1,734,734 | $2,968,995 | 525,000 | $160,753 |
| | 2003 | $1,000,000 | $1,354,666 | $10,502,000 | 350,000 | $35,557 |
| | 2002 | $852,500 | $1,034,797 | $1,354,900 | 375,000 | $102,821 |
| | 2001 | $714,667 | $134,505 | $2,388,750 | 1,025,000 | $14,898 |
| | 2000 | $544,250 | $149,375 | $1,064,062 | 600,000 | $5,449 |
| | 1999 | $522,917 | $322,078 | $1,556,250 | 225,000 | $31,934 |
| | 1998 | $449,083 | $349,261 | $1,282,032 | 1,361,250 | $32,193 |
| | 1997 | $392,084 | $218,235 | $1,005,552 | 250,000 | $1,107 |
| | 1996 | $302,775 | $208,257 | $774,375 | 115,000 | - |
| | 1995 | $241,250 | $183,597 | - | 74,250 | - |
| | 1994 | $184,583 | $161,582 | - | 168,750 | - |

Included in Sargent's compensation were the grants or awards of stock options as alleged in ¶ 81 below. Defendant Sargent engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

24.     Defendant Patrick Hickey ("Hickey") served as the Company's Senior Vice President-Corporate Controller from November 1999 to in or about 2002, as Vice President and Treasurer from September 1997 to November 1999, as Vice President-Financial Planning, Analysis & Reporting from January 1996 to September 1997, as Director of Financial Planning from October 1994 to January 1996, and in various other capacities since joining Staples in June 1993. Because of Hickey's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via

access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Defendant Hickey engaged in the sale of Staples shares that he personally held, for significant proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

25.     Defendant John J. Mahoney ("Mahoney") has served as the Company's Vice Chairman and Chief Financial Officer since January 2006. Mahoney also served as the Company's Executive Vice President, Chief Administrative Officer and Chief Financial Officer from October 1997 to January 2006, and as Executive Vice President and Chief Financial Officer from September 1996 to October 1997.  Because of Mahoney's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Mahoney received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Mahoney engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders.  Staples has paid Mahoney the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|-------------------------------------------------|------------------------|
| Mahoney | 2005 | $590,883 | $364,203 | $1,466,100 | 150,000 | $138,700 |
| | 2004 | $570,167 | $593,536 | $2,509,245 | 150,000 | $92,859 |
| | 2003 | $544,399 | $442,687 | $1,172,700 | 100,000 | $25,979 |
| | 2002 | $513,750 | $373,368 | $609,705 | 100,000 | $70,210 |
| | 2001 | $498,633 | $74,831 | $614,250 | 100,000 | $15,795 |
| | 2000 | $482,050 | $121,278 | $638,437 | 300,000 | $19,187 |
| | 1999 | $463,000 | $261,413 | $933,750 | 90,000 | $41,876 |
| | 1998 | $439,250 | $335,880 | $1,172,813 | 585,000 | $42,848 |
| | 1997 | $395,834 | $220,160 | $1,033,614 | 220,000 | - |
| | 1996 | $171,243 | $251,210 | $774,375 | 232,500 | - |
| | 1995 | - | - | - | - | - |
| | 1994 | - | - | - | - | - |

Included in Mahoney's compensation were the grants or awards of stock options as alleged in ¶ 81 below.  Defendant Mahoney engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

26.    Defendant Susan S. Hoyt ("Hoyt") has served as the Company's Executive Vice President – Human Resources since July 1996.  Because of Hoyt's position, she knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.  Hoyt received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Hoyt engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders.  Staples paid Hoyt the following compensation from 1998 through 2001:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|---|---|---|---|---|---|---|
| Hoyt | 2001 | $463,517 | $57,972 | $341,250 | 50,000 | $23,142 |
| | 2000 | $445,767 | $101,954 | $354,687 | 125,000 | $29,214 |
| | 1999 | $428,292 | $220,494 | $518,750 | 50,000 | $26,127 |
| | 1998 | $407,875 | $283,535 | $651,562 | 300,000 | $17,220 |

Included in Hoyt's compensation were the grants or awards of stock options as alleged in ¶ 81 below.  Defendant Hoyt engaged in the sale of Staples shares that she personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

27.     Defendant John C. Bingleman ("Bingleman") served as the Company's President Staples International from February 1997 to June 2000 and as President – North American Superstores from August 1994 to February 1997.  Because of Bingleman's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Bingleman received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Bingleman engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders.  Staples paid Bingleman the following compensation from 1994 through 1999:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Long-Term Compensation Awards-Stock Options (#) | All Other Compensation |
|---|---|---|---|---|---|---|
| Bingleman | 1999 | $428,292 | $225,865 | - | - | $51,966 |
| | 1998 | $410,735 | $311,889 | $5,460,947 | 450,000 | $150,152 |
| | 1997 | $385,883 | $215,555 | - | - | $2,756 |
| | 1996 | $356,609 | $243,065 | $774,375 | 115,000 | - |
| | 1995 | $327,892 | $120,015 | - | 103,500 | $20,905 |
| | 1994 | $99,191 | $144,846 | - | 300,375 | - |

Included in Bingleman's compensation were the grants or awards of stock options as alleged in ¶ 81 below.  Defendant Bingleman engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

28.     Defendant Robert K. Mayerson ("Mayerson") served as the Company's Senior Vice President and Treasurer from October 2002 to in or about 2004, as Senior Vice President and Corporate Controller from September 1997 to 1999, as Senior Vice President and Treasurer from April 1997 to September 1997, and as Vice President and Treasurer from August 1993 to April 1997.  Because of Mayerson's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Defendant Mayerson engaged in the sale of Staples shares that he personally held, for significant proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

17

29.     Defendant Jeffrey E. Nachbor ("Nachbor") served as the Company's Senior Vice President, Corporate Controller from April 1993 to February 2005.  Because of Nachbor's position, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

30.     Collectively, the Defendants referenced in ¶¶ 18-29 are referred to herein as the "Officer Defendants."

**Director Defendants**

31.     Defendant Basil L. Anderson ("Anderson") has served as a Director of the Company since 1997.  Anderson served as the Company's Vice Chairman of the Board from September 2001 to March 2006, and further served as a member of the Audit Committee of the Board ("Audit Committee") from 1997 to 2001, including as its Chairman from 1998 to 2001.  Because of Anderson's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Anderson received options that were dated at or very close to the lowest stock price for the period during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Anderson engineered, received or otherwise obtained backdated stock options and illegal compensation from Staples that was not disclosed to the Company's shareholders.  Defendant Anderson engaged in the sale of Staples

shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

32.     Defendant Brenda C. Barnes ("Barnes") has served as a Director of the Company since June 2002 and as a member of the Compensation Committee of the Board ("Compensation Committee") since 2003.  Barnes also served as a member of the Audit Committee in 2002 and 2003.  Because of Barnes' positions, she knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and Committees thereof and via reports and other information provided to her in connection therewith.

33.     Defendant Arthur M. Blank ("Blank") has served as a Director of the Company since 2001 and as a member of the Compensation Committee since 2001.  Because of Blank's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and Committees thereof and via reports and other information provided to him in connection therewith.

34.     Defendant Mary Elizabeth Burton ("Burton") has served as a Director of the Company since June 1993 and as a member of the Audit Committee since at least 1994.  Because of Burton's positions, she knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at management and Board meetings and Committees thereof and via reports and other information provided to her in connection therewith.  Defendant Burton engaged in the sale of Staples shares that she personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

35.     Defendant Rowland T. Moriarty ("Moriarty") has served as a Director of the Company since March 1986.  Because of Moriarty's position, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and Committees thereof and via reports and other information provided to him in connection therewith.  Defendant Moriarty engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

36.     Defendant Robert C. Nakasone ("Nakasone") has served as a Director of the Company since January 1986. Nakasone also served as a member of the Compensation Committee from at least 1994 to 2002, including as its Chairman from at least 1994 to 1999. Because of Nakasone's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and Committees thereof and via reports and other information provided to him in connection therewith.  Defendant Nakasone engaged in the sale of Staples shares that he personally held, for millions of dollars in

proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

37.     Defendant Martin Trust ("Trust") has served as a Director of the Company since June 1987.  Trust also served as a member of the Compensation Committee from at least 1994 to 1995 and from 1996 to 2003, including as its Chairman from 1999 to 2003.  Because of Trust's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and Committees thereof and via reports and other information provided to him in connection therewith.  Defendant Trust engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

38.     Defendant Paul F. Walsh ("Walsh") has served as a Director of the Company since December 1990 and as a member of the Audit Committee since at least 1994, including serving as its Chairman from at least 1994 to 1998 and since 2001.  Because of Walsh's positions, he knew or should have known that Staples executives and directors were improperly backdating stock-option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and Committees thereof and via reports and other information provided to him in connection therewith.  Defendant Walsh engaged in the sale of Staples shares that he personally held, for millions of dollars in proceeds

while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

39.     Collectively, the Defendants referenced in ¶¶ 31-38 are referred to herein as the "Director Defendants," the Defendants referenced in ¶¶ 32-33, 36-37 are referred to herein as the "Compensation Committee Defendants," and the Defendants referenced in ¶¶ 31, 34, 38 are referred to herein as the "Audit Committee Defendants."

40.     Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

41.     As executive officers and/or Board members, the Individual Defendants approved and received the backdated Staples stock options at issue in this case. The Individual Defendants assisted in the preparation of Staples' annual and quarterly reports from 1994 through 2006 and reviewed, approved and/or helped to prepare each proxy statement Staples filed from 1995 to 2004, which falsely represented that Staples stock options were granted at the fair market value per share of common stock on the date of the grant, in order to conceal the existence of and their participation in the Individual Defendants' integrated and continuous scheme to backdate (and conceal the backdating of) Staples stock option grants. As a result of the foregoing, the Individual Defendants personally and financially benefited from the backdated Staples stock option grants particularized herein.

42.     Furthermore, Defendants Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarity, Nakasone, Trust and Walsh signed Staples' financial statements for 1994 to 2006, which materially understated the Company's compensation expense and materially overstated its net income. In addition, Defendants Stemberg, Vassalluzzo, Sargent, Hickey, Mahoney, Hoyt, Bingleman, Mayerson,

Anderson, Burton, Moriarity, Nakasone, Trust and Walsh sold over $398.6 million of Staples stock based upon their knowledge of material non-public information regarding the undisclosed practice of backdating stock options in violation of federal securities laws.

## BACKGROUND OF STOCK OPTIONS

### Purpose of Stock Options

43.      The purpose of a stock option granted by a corporation to an officer, director, employee, or other person allows the option holder to purchase the corporation's stock at a specified price - referred to as the "exercise price" - for a specified period of time. Under most stock option plans, the exercise price of the option is based on the price of the stock as of the grant date, which could be the closing price of the stock on that date, an average of the high and low of the prices on that date, or other valuation method. When the holder of a stock option exercises such an option, he or she purchases the stock from the company at the exercise price — regardless of the stock's market price at the time the option is exercised.  Under most plans, the employees or option recipient can not exercise the options until a vesting period has passed. Options with a strike price equal to the current trading price of the underlying stock are referred to as being "at the money" and options with a strike price below the current trading price of the stock are "in the money."

44.      Companies typically grant stock options to their executives and directors as equity-based compensation, which is intended to create incentives to boost profitability and increase the overall value of the enterprise. Thus, stock options are intended to align the interests of company management with those of shareholders. With a significant option package, members of company management have a great incentive to improve the company's business;

such efforts tend to raise the company's share price, which increases both the value of his or her options and shareholder returns.

45.     There are several reasons why stock options have been increasingly included in the compensation packages of executives and non-executives.   According to SEC Chairman Christopher Cox, beginning in 1972, the accounting rule was that employee stock options would not have to be shown as an expense on the income statements – so long as the terms were fixed when the option was granted, and so long as the exercise price was equal to the market price on that day.

46.     Further, as indicated by Linda Thomsen, Director of the SEC's Division of Enforcement, options became more popular after Section 162(m) of the federal tax laws went into effect in 1993, which limited the tax deductibility of compensation awarded to certain top executives to $1 million.   This change in the tax law tilted compensation practices away from salary and other forms of compensation in favor of performance based compensation to which the cap didn't apply, such as stock options.   Unfortunately, as the use of options compensation has increased, so has the abusive practice of backdating.

**Backdating of Stock Options**

47.     The improper practice of "backdating" stock options occurs when one or more individuals within a company retroactively sets the exercise price for a stock option based on a date other than the grant date of the option.   Significant accounting, disclosure and tax consequences resulting from grants of "in the money" options provide an incentive for corporate executives to covertly backdate these options.   If an option is backdated to a day on which the stock's market price was lower than the price on the day the option was granted, the holder pays less and the company receives less money for the stock when the option is exercised. This

arrangement gives the executive or director greater compensation than that to which he or she is entitled, and undermines the incentive value of the option grant.

48.     As a result, as indicated in the testimony of United States Deputy Attorney General Paul McNulty before the Senate Committee on Finance, "some corporate executives have engaged in schemes to falsify corporate books and records, to mislead the corporation's board of directors and outside auditors, to file false reports and financial statements with the Securities and Exchange Commission (SEC), and to mislead shareholders, the investing public and the financial press."

49.     On a fundamental level, backdated options allow company executives and directors to prosper without building long-term shareholder value. By giving them an instant paper profit, backdating undermines the purpose of options - which is to motivate those who lead the company to act in ways that improve the business and consequently lift the stock price. Indeed, backdating is a lot like betting on a poker hand after all the cards are displayed.

50.     The practice of backdating stock options can result in significant adverse tax consequences for the company. Under Section 162(m) of the Internal Revenue Code ("Section 162(m)"), at-the-money options are usually considered performance-based compensation (typically granted to the five highest paid executives) that is deductible from corporate tax returns even if an executive earns more than $1 million a year. If it turned out that these performance-based options were actually in-the-money options, however, it would automatically disqualify such options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the five highest-paid executives. In effect, the problem with backdating is that it allows in-the-money options to appear in regulatory filings as if they were ordinary at-the-money grants. Ultimately, if it turns out that the exercise price of an option has to

be corrected or if a previously issued option is disallowed altogether, any tax benefits from employee stock option exercises the Company may have received must either be adjusted or eliminated with the Company suffering, of course, from the interest and penalties assessed or to be assessed by the IRS relative to the backdating.

      51.     Other implications are seen in the context of the two common forms of employee options – non-statutory stock options, or "NSOs", and incentive stock options, or "ISOs", as indicated in the testimony of Linda Thomsen, Director of the SEC's Division of Enforcement before the U.S. Senate Committee on Finance, on September 6, 2006:

> When an employee exercises a non-statutory option, the difference between the exercise price and the fair market value of the company's stock on the date of exercise is treated as ordinary compensation and the employee is generally taxed on the gain at his or her ordinary income tax rates. The company incurs employee withholding obligations on this gain, but also is entitled to an associated tax deduction on the gain. When companies backdate option grants to a lower exercise price, employees can obtain a larger taxable gain upon the exercise of an NSO and companies can obtain a correspondingly larger tax deduction and withholding obligation on that gain.

> Unlike the exercise of NSOs, incentive stock options, or ISOs, afford employees favorable tax treatment because any gain at exercise is not taxed as ordinary income, although the gain may be subject to alternative minimum tax. Accordingly, a company does not obtain any corresponding tax deduction (or incur withholding obligations) at the time of exercise. In addition, if an employee holds the stock for the statutory holding period prior to sale – one year after exercise and two years after grant – then the sale is considered a "qualifying disposition" and the entire gain on sale is taxed at favorable capital gains rates. However, among the statutory requirements of ISOs is that they be granted at-the-money. An ISO that is granted in-the-money loses its favorable status and instead is treated under the tax code as a non-statutory option (NSO), including ordinary income recognition by the employee on any gain at exercise and a corresponding tax deduction by the company on that gain. Backdating allows an employee to treat what is in fact a non-qualified option as an incentive stock option, which can result in the employee underpaying taxes while causing the company to lose the tax deduction to which it otherwise would have been entitled.

The instant paper profit received by certain Staples executives and directors through the use of backdated stock options raises serious accounting issues. Under the Generally Accepted Accounting Principles ("GAAP"), this instant paper profit was equivalent to extra compensation and should have been reflected as a cost to Staples in the Company's financial statements. But

as Staples failed to properly record the costs associated with the extra compensation in its financial statements, its profits were overstated during the fiscal periods in which the options were granted.

52.    Alarmingly, certain Staples executive officers and directors, on multiple occasions, egregiously awarded themselves and their associates options backdated to dates just prior to a large increase in the Company's stock price.   As a result of these backdated options grants, these officers and directors were unjustly enriched to the detriment of the Company and its shareholders.   Backdating the options also breached these individuals' fiduciary duties of care, loyalty, honesty and good faith, as well as their duties of accurate disclosure.

**The Backdating Scandal Backlash**

53.    Over the past year, as the public has become aware of illegal stock options backdating and the resulting harm to investors and important economic institutions that drive America's growth, the wheels of justice have begun to turn.

54.    At last count, over 200 companies have announced internal reviews or U.S. government investigations of past stock option granting practices.   U.S. prosecutors have filed criminal fraud charges over the issue against former executives of Brocade Communications Systems, Inc. and Converse Technology, Inc.   At least 140 companies are being investigated by the U.S. Government, and on October 24, 2006, at least one former corporate executive has pleaded guilty in federal court to charges relating to stock options backdating.   Other corporate executives such as United Health Group, Inc.'s long time chief executive William McGuire have stepped down, while others, such as Comverse Technology Inc.'s former CEO, Jacob "Kobi" Alexander, have fled the country while secreting tens of millions of dollars in Middle East banks

accounts.   An analysis by institutional shareholder advisory firm Glass Lewis estimates that the stock options backdating scandal has cost companies nationwide approximately $10.3 billion.

55.    On March 18, 2006, an article appeared in the *Wall Street Journal* entitled, "The Perfect Payday - Some CEOs reap millions by landing stock options when they are most valuable; Luck - or something else?"  The article stated in pertinent part:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year.  Oddly, that was good news for Chief Executive Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years.  Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding.  It was the same through much of Mr. Rich's tenure: In a striking pattern all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky?  A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion.  The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to change, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason:  They were backdated.  The SEC is understood to be looking at about a dozen companies' option grants with this in mind.
>
> The Journal's analysis of grant dates and stock movements suggests the problem may be broader.  It identified several companies with wildly improbably option-grant patterns.  While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates.  (An explanation of the methodology is below.)
>
> The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002.  If so, it was another way some executives enriched themselves during the boom at shareholders' expense.  And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.
>
> * * *
>
> Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price.  The right usually doesn't vest for a year or more, but then it continues for several years.  The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before.  Naturally, the lower it is, the more money the recipient can potentially make someday be exercising the options.

Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. No stock gain, no profit on the options. Backdating them so they carry a lower price would run counter to this goal, by giving the recipient a paper gain right from the start.

Companies have a right to give executives lavish compensation if they choose to, but they can't mislead shareholders about it. Granting an option at a price below the current market value, while not illegal in itself, could result in false disclosure. That's because companies grant their options under a shareholder-approved "option plan" on file with the SEC. The plans typically say options will carry the stock price of the day the company awards them or the day before. If it turns out they carry some other price, the company could be in violation of its options plan, and potentially vulnerable to an allegation of securities fraud.

It could even face accounting issues. Options priced below the stock's fair market value when they're awarded bring the recipient an instance paper gain. Under accounting rules, that's equivalent to extra pay and thus is a cost to the company. A company that failed to include such a cost in its books may have overstated its profits, and might need to restate past financial results.

* * *

The SEC's look at options timing was largely prompted by academic research that examined thousands of companies and found odd patterns of stock movement around the dates of grants. One study was by Erik Lie of the University of Iowa. He found that share prices generally fell before option grants and rose afterward, with the result that recipients got options at favorable times. He concluded this was so unlikely to happen by chance that at least some grant dates had to have been filled in retroactively.

Another possible explanation for big rises in stock prices following grants is that executives knew favorable company news was coming and timed the grants just before it. But academics think timing for company news is a less likely explanation for the patterns, given the consistency of the stock climbs after grant dates. Also, for many of the companies the Journal examined, no obvious company news followed closely upon the option grants.

It's also possible companies sometimes award options after their stock has taken a fall and seems to them to be undervalued. In point of fact, the companies can't possibly know what the stock will do next, but that doesn't mean they might not feel confident enough about a recovery to think they are hitting a favorable time to grant options.

The use of stock options surged in the late 1990s as young firms that had bright prospects but little revenue used them to attract and pay executives. As dot-com and telecom shares exploded, stock options became a source of vast wealth.

They also grew controversial.  Critics worried that big options grants tempted executives to do whatever it took to get the stock price up, at least long enough to cash in their options.  At the same time, during a general bull market, the options sometimes richly rewarded executives for stock buoyancy that had little to do with their own efforts.

* * *

In some instances, backdating wouldn't be possible without inattentive directors, securities lawyers say.  At one company the SEC is looking at, lawyers say, it appears that someone picked a favorable past date for an option grant and gave it to directors for retroactive approval, perhaps counting on them not to notice.  In another case, the lawyers say, a space for the grant date appears to have been left blank on paperwork approved by directors, or dates were later altered.

56.     On May 5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

57.     Following the President's interview, a plethora of commentary and articles began to circulate in the public domain, including, for example:

a.     In May 2005, Management Science (Vol. 51, No. 5) published an article entitled "On the Timing of CEO Stock Option Awards."

b.     In a recent article published by the *Wall Street Journal* on May 22, 2006 entitled "Five More Companies Show Questionable Options Pattern:  Chip Industry's KLA-Tencor Among Firms With Grants Before Stock-Price Jumps - A 20 Million-to-one Shot," Arthur Levitt, a former Chairman of the SEC, was quoted as stating that stock option backdating "represents the ultimate in greed." Further, Levitt stated, ***"It is stealing, in effect. It is ripping off shareholders in an unconscionable way."*** (Emphasis added).

c.     Harvey Pitt, the former chairman of the SEC from 2001-2003, weighed in on the developing backdating scandal in a May 26, 2006 article he authored for Forbes.com entitled "The Next Big Scandal." He opined that backdating options grants constitutes fiduciary

misconduct, remarking that ***"[f]or one thing, it likely renders a company's proxy materials false and misleading."*** (Emphasis added). Pitt continued: "Securities law violations are not the only potential problems with backdating options grants. Backdating may violate the Internal Revenue Code...." He added that on the state level, "backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity." "More fundamentally," Pitt explained, "the financial statements of a company that has engaged in backdating may require restatement. The options may not be deductible, and the expenses, as well as the various periods to which they may have been allocated, may also be incorrect. These factors would require a restatement, with class action litigation in the offing."

      d.    In June 2006, researchers M.P. Narayanan and H. Nejat Seyhun analyzed the backdating of stock option grants in an article entitled "The Dating Game: Do Managers Designate Option Grant Dates to Increase Their Compensation?"

58.    On September 6, 2006, during Senate hearings on the backdating of stock options, Legislative leaders have noted the serious national importance of dealing with this issue. Senator Paul S. Sarbanes stated:

> Federal securities laws are predicated in large part on public companies making full and fair disclosure. Investors rely on companies' disclosures in their investment decisions and obviously they expect honest representations. If a company makes misleading or fraudulent statements, investors will lose confidence in their company's accounting, internal controls and management. Regrettably, if enough companies engage in misconduct, ***investors will begin to question the integrity of the U.S. capital markets. Their reputation for integrity has been an important economic asset for the Nation.*** (Emphasis added).

59.    In addition to warning about the threat posed to our national economy by stock options backdating and the reputation of our financial markets, the Senate has also decried the greed and exploitation of shareholders. Senator Chuck Grassley stated in regards to stock options backdating:

It is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an "honest day's work for an honest day's pay" and replaces it with a phrase that we hear all too often today, "I'm going to get mine." Even worse in this situation, most of the perpetrators had already gotten "theirs" in the form of six-and seven-figure compensation packages of which most working Americans can only dream. But apparently that was not enough for some. Instead, ***shareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called "back-dating"*** – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. (Emphasis added).

60. In addition to accounting issues and gross breaches of fiduciary duties by officers and/or directors of Staples, the backdating of stock options can have severe tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants. For example, for performance-based stock options (generally granted to the five highest-paid executives), a company is allowed to take a tax deduction on that full amount ***provided that the options were granted at the market price***. Backdating, however, automatically disqualifies those options from receiving the tax break—instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

61. In light of these serious potential tax-related ramifications, the IRS is now examining as many as 40 companies for backdating stock options to determine whether they owe millions of dollars in unpaid taxes. Staples may well join this list given its recent involvement in the backdating scandal. On July 28, 2006, *The New York Times* published an article entitled "I.R.S. Reviewing Companies in Options Inquiries," which stated:

> Internal Revenue Service is examining as many as 40 companies ensnared in various stock options investigations to determine whether they owe millions of dollars in unpaid taxes…

* * *

In the last few weeks, the agency has directed its corporate auditors to start reviewing the tax returns of dozens of executives and companies, which may have improperly reported stock option grants. These preliminary investigations are expected to take months, but if there is early evidence of widespread tax trouble, I.R.S. officials said they were prepared to step up their effort.

"Where there are indications of mischief, we want to now look at those cases and see if they complied with tax laws," said Bruce Ungar, the agency's deputy commissioner for large and midsize businesses. "It is possible that they are compliant, but the early indication is that there is a good likelihood there is some noncompliance."

"If this is a big problem, we will apply more resources," he added.

The I.R.S. auditors are focusing on the potential tax obligations from backdated stock options that have been cashed out since 2002. Federal rules bar the I.R.S. from opening cases that are more than three years old. Still, tax lawyers estimate the agency could reap hundreds of millions of dollars from civil penalties, unpaid taxes and interest payments if widespread wrongdoing is found.

The agency appears to be taking aim both at companies that took improper tax deductions, and at executives who received favorable tax treatment and might have misreported income.

So far, rank-and-file employees who simply received potentially backdated stock options are not in the agency's cross hairs.

"If you were involved in the mischief, you would want to be worried," Mr. Ungar said. "If you weren't involved in it, then you are not in the same situation."

The tax scrutiny is the latest twist in what is perhaps the biggest financial scandal of the year and comes as the agency cracks down on misreported executive pay. The I.R.S. follows several other federal agencies that have begun investigations into the myriad problems that arise from improperly reported or backdated stock option grants.

The Securities and Exchange Commission has said it is examining 80 companies for potential accounting and disclosure problems. On Wednesday, it underlined that focus with new rules on reporting executive compensation. The Justice Department has issued subpoenas to at least 35 companies and last week brought its first criminal charges, against two former executives of Brocade Communications. Now, tax troubles may be next.

By itself, backdating stock option grants is not illegal. But it can have severe tax consequences separate from potential accounting violations. While ordinary stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not. Backdating effectively allows such in-the-money options to appear in regulatory filings as if they were ordinary grants.

The I.R.S. is broadly focused on two main areas that may have been abused: performance-based stock options for top executives and incentive stock

options that were frequently handed out to the rank and file. Each receives a different type of tax treatment.

Performance-based stock options are generally granted to the five highest-paid executives and can often be worth tens, if not hundreds of millions of dollars when they are cashed out. So long as the options meet certain standards, such as being granted at the market price, companies are allowed to take a tax deduction on that full amount.

But backdating — effectively granting stock options with a discount — automatically disqualifies those options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

"If these companies have been deducting huge option grants that they actually couldn't deduct, that seems like a big pile of money out there," said Larry R. Langdon, a tax lawyer in Palo Alto, Calif., and a former I.R.S. commissioner.

Improperly awarded incentive stock options could lead to even more tax trouble. Backdating, which grants a discounted option, effectively voids the favorable tax treatment that incentive stock options provide employees, rendering their individual tax returns inaccurate. Companies, meanwhile, could be faulted for underreporting their payroll tax.

"Maybe it is not a widespread problem, but if this happened to five employees, you have five nightmares," said Fred Whittlesey, an executive pay consultant and head of the Compensation Venture Group. "Employees will have a legal and companies will have an ethical responsibility to insulate them from what happened based on actions of a few people."

The I.R.S. assembled a five-member task force to oversee its examinations about two months ago. And in the last few weeks, the Internal Revenue commissioner, Mark W. Everson, directed the agency's corporate auditors to look into potential tax issues as dozens of companies have come forward. In a statement, he called on them to "consult closely with the S.E.C. to determine which companies merit scrutiny."

Last week, I.R.S. officials held their first meeting with Linda Chatman Thomsen, the director of the S.E.C.'s enforcement division. She indicated that there were tax issues in the cases that securities regulators were investigating, Mr. Ungar said.

For now, I.R.S. officials are reviewing the files of 30 to 40 of the companies that have publicly disclosed problems, including some already facing scrutiny on other tax issues. Mr. Ungar said it could take months to more than a year before these initial cases are resolved. Much of the information will need to be supplied by the companies themselves, not taken from tax returns. I.R.S. officials have not yet been in touch with the Justice Department about potential tax fraud.

62.     This is but the tip of the iceberg in terms of regulatory scrutiny.  Indeed, an article

in *The Wall Street Journal* on February 9, 2007, reported on a policy being formulated by the

IRS that would require companies to pay the tax liabilities of employees who received, but were

unaware of the improper basis on which their options grants had been valued.  The article stated:

**IRS Urges Companies to Pay Taxes Owed by Workers Unaware of Backdated Options**

WASHINGTON -- The Internal Revenue Service has come up with a plan to help rank-and-file employees who owe taxes because they unwittingly received backdated stock options: Have their employers pick up the tab.

The IRS initiative, which is voluntary, proposes that companies with backdating problems pay the steep additional taxes due from lower-level employees who exercised backdated stock options in 2006.

The theory: Employees who had nothing to do with receiving backdated options shouldn't be penalized. Top corporate officials of companies with backdating problems will remain on the hook for taxes on exercised stock options that were backdated.

"We're sending the message here that a proper penalty has to be paid but allowing it to be resolved by the companies so [lower-ranking] individuals aren't swallowing the penalty," IRS Commissioner Mark W. Everson said in an interview. "We think it's appropriate to pursue more directly individuals who were manipulating and benefiting from the untoward conduct."

The IRS program comes as more than 140 companies are facing potential problems about how their stock options were dated. More than 130 companies are under investigation by the Securities and Exchange Commission, and the Justice Department has charged five executives with criminal wrongdoing in connection with stock-options backdating. …

The initiative comes in response to a request by a group of lawyers and accountants who sought to develop a settlement program where companies would pay something less than the full tax that employees would be charged. …

The IRS has given companies until Feb. 28 to notify the agency of their intention to participate in the program and until March 15 to contact employees about their participation. The program applies only to options that vested in 2005 and 2006 and were exercised last year. …

Under IRS rules, employees have to pay regular income tax on income they have received from exercising stock options, based on the difference between the option's strike price and the market value of the stock when the option is exercised

For employees who received backdated options, they may have to pay an additional 20% tax, plus an interest tax, under 2004 deferred-compensation regulations. The rules don't apply to options that vested before 2005.

While companies can't resolve their top executives' taxes through this program, some have taken steps to spare them from the tax on any options they haven't yet exercised, by repricing the options to fix the backdating. In some of these cases, the companies have paid the executives a special bonus to compensate them for the repricing.

## Criminal Nature of Backdating Misconduct

63.     As noted in Deputy Attorney General McNulty's testimony before the Senate Finance Committee, "[w]hen stock options are surreptitiously backdated, the corporation will file false and misleading reports and financial statements with the SEC and other regulatory authorities.  By doing that, the corporation disseminates false and fraudulent information to the investing public.  Failing to report the backdating of options misrepresents the true nature of stock option plans and executive compensation and thus, a company obtains shareholder approval for the company's compensation plans under false pretenses.  Grants of backdated options contrary to the terms of shareholder-approved option compensation plans can also be considered an embezzlement of corporate assets because the defendants are misappropriating shares of the company at an unauthorized and discounted value."

64.     These acts can be criminal for several reasons as noted by Deputy Attorney General McNulty:

First, a grant of "in the money" options is treated under accounting principles as compensation to the option holder, and therefore should be treated as an expense by the corporation and be deducted from reported revenue.  In contrast, grants of options with an exercise price either above or at the trading price on the real grant date are not considered an expense of the corporation.  Thus, if a corporation both backdates options and prices them "in the money" without properly disclosing this fact, the corporation is falsifying its books and records, fraudulently decreasing expenses and falsely inflating profits.  Second, backdating of stock options also conceals the fact that employees are being given the right to purchase the underlying stock at a discount from the fair market value on the date the

option was really granted – and that misrepresents the employee's compensation. Finally, the sale of the underlying stock to these favored employees at a discount to the market price dilutes the value of the shares held by stockholders.

65.     On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc., executives for illegally manipulating stock option grant dates. Criminal indictments were brought simultaneously in federal court, indicating the serious view taken by governmental agencies with respect to improperly backdated options. In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed that "***the full weight of the Federal government is being put behind this effort to stamp out fraudulent stock option backdating***." (Emphasis added). He disclosed that additional cases likely would he brought in the "coming weeks and months." Cox further indicated that the SEC was then investigating more than 80 companies, a large percentage of which are technology companies, meaning many more executives could face criminal charges related to manipulating options.

66.     On July 31, 2006, the Federal Bureau of Investigation issued an arrest warrant for Jacob "Kobi" Alexander ("Alexander"), the former CEO of Comverse Technology, Inc. Alexander is charged with conspiracy related to backdated stock options. Not surprisingly, on August 9, 2006, he and fellow company cohorts David Kreinberg ("Kreinberg") (Comverse's former Chief Financial Officer) and William F. Sorin (Comverse's former General Counsel) were criminally charged by the U.S. Attorney's Office in the Eastern District of New York for allegedly orchestrating a decade old scheme to fraudulently backdate option grants and for operating a secret stock options slush fund. After transferring more than $57 million from the U.S. to accounts in the Middle East, Alexander fled the country. Emphasizing the importance that the U.S. government has placed on dealing with the backdating options scandal, Alexander was placed on the FBI's most wanted list. On September 27, 2006, after an international

manhunt, Alexander was captured in Namibia, and is expected to be extradited to the United States to stand trial.   On October 24, 2006, less than 3 months after being charged, it was announced that Kreinberg had pleaded guilty to securities-fraud charges related to stock options backdating in federal court.

67.   This resolve of the government is being felt not only through the federal grand jury indictments and acceptance of guilty pleas in federal court, as well as the concerted action of the Justice Department and the SEC, but also through statements of leading legislative figures such as those of Senator Chuck Grassley in regards to stock options backdating:

> It is important that we defend the American principles of capitalism and free market innovation, and it is also important that we defend the equally important American principles of fairness and the rule of law.   These are not conflicting principles.   They are the back bone of our nation.   ***And those who violate them need to answer for that***. (Emphasis added).

## Materiality of Backdating

68.   The Defendants' withholding information about their backdating of stock options was material to Staples' financial statements and should have been reported long ago.   Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449 (1976) and in SEC Staff Accounting Bulletin No. 99 ("SAB 99"), released August 12, 1999.   The Court ruled in *TSC Industries* that a fact is material to investors if there is "a substantial likelihood that the…fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."   SAB 99 helps explain that ruling by summarizing the law and accounting rules on materiality as they have existed throughout the defendants' actions.   SAB 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than

purely quantitative factors alone.  Qualitative factors that can make a misstated fact material include, among others:

a.       whether the misstatement has the effect of increasing management's compensation — for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

b.       whether the misstatement arises from an item "capable of precise measurement";

c.       whether the misstatement masks a change in earnings;

d.       whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

e.       whether the misstatement affects the registrant's compliance with regulatory requirements.

69.     The improper backdating of stock options is material under both a qualitative and a quantitative analysis.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about Staples. That is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's.  As the SEC ruled in the administrative case *In re Franchard Corp.*, the integrity of a company's management "is always a material factor."  42 S.E.C. 163 (1964).  Second, the improper backdating increased management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation.  Third, the correct dates of option grants and the correct closing prices for stock on those days can be precisely recorded and measured.  Fourth, the

improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses.   Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability.   Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses.   Thus, the Defendants always have been on notice when their stock option backdating was material and should have been disclosed.

70.     Although any of the above qualitative factors would have identified the Defendants' stock option backdating as "material," the backdating also was material under quantitative criteria.   Backdating contributed to the Defendants' ability to sell millions of dollars worth of the Company's stock while in possession of material, non-public adverse information about the backdating practices.   Therefore, the Defendants' only appropriate response would be to correct the errors for each of the periods affected by the backdating scheme and thus allow the shareholders and the investing public the transparency they deserve.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

71.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

72.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

73.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

    d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

    e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

74.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting

financial data, a corporation must establish an internal accounting control structure.   Among

other things, the Individual Defendants were required to:

> a.   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> b.   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
>> i.   transactions are executed in accordance with management's general or specific authorization; and
>>
>> ii.   transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

75.   Staples' Audit Committee Charter provides that the Audit Committee shall,

among other things:

> a.   Review and discuss with the Company's management and independent auditor the Company's audited financial  statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the matters about which Statement on Auditing Standards No. 61 requires discussion;
>
> b.   Consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K;
>
> c.   Prepare for inclusion in a proxy or information statement of the Company relating to an annual meeting of security holders at which directors are to be elected, the report described in Item 306 of Regulation S-K;
>
> d.   Discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"
>
> e.   Oversee the Company's internal accounting controls and the Company's disclosure controls and procedures on behalf of the Board of Directors;
>
> f.   Receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Securities Exchange Act; and

g.      Provide input to the Compensation Committee on the evaluation of the Company's financial management personnel.

76.     Staples' Compensation Committee Charter provides that the main functions of the Compensation Committee, among other things, are:

a.      *administer*, periodically review and make recommendations to the Board with respect to employee benefit plans, including *all incentive-compensation plans and equity-based plans*; and

b.      exercise all rights, authority and functions of the Board under all of the Company's stock option, stock incentive, employee stock purchase and other equity-based plans, including without limitation, the *authority to interpret the terms thereof, to grant options thereunder and to make stock awards thereunder*. (Emphasis added).

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Individual Defendants

77.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including all versions of the 1987 Stock Option Plan and the 1992 Equity Incentive Plan (collectively, the "Plans"), all Staples stock option grants must have an exercise price equal to the "fair market value of the common stock on the date of grant" or must "not be less than 100% of the fair market value of Staples' common stock at the date of grant," where "fair market value" is "the closing price per share of Staples Common Stock on the Nasdaq National Market."

78.     Despite the material risk involved, Defendants engaged in, aided and abetted improper and illegal activities involving backdating of stock options, false and misleading accounting of those options, and false and misleading disclosures about the options.  Defendants have persisted in that improper activity even while representing that they are using stock option grants to improve the Company's future performance.

79.     From 1994 to 2003, the Compensation committee, which, according to the Company's proxy statements filed with the SEC from 1995 to 2004, was responsible to "set the compensation levels of executive officers (subject to review by Board of Directors), provide recommendations to the Board regarding compensation programs, administer Staples' equity incentive, stock purchase and other employee benefit plans and authorize option and restricted stock grants," with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Staples stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated stock options.

80.     The members of the Board who were not on the Compensation Committee had actual knowledge of the backdating and knew that it violated the terms of the Plans, APB 25 and Section 162(m).   All of the Board members knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted stock options with exercise prices not less than the fair market value of Staples stock on the date of grant were false because the grants were, in fact, backdated.   Furthermore, the entire Board knowingly and deliberately approved the stock option backdating scheme with knowledge of its consequences, *e.g.*, its effects on Staples' financial statements.

81.     Dating back to 1994, with the knowledge and approval of the full Board, the Compensation Committee granted Staples stock options to certain of the Individual Defendants, as follows:

| Officer | Purported Date of Grant | Purported Exercise Price | Number of Options |
|---|---|---|---|
| Stemberg | 9/23/94 | $19.75 | 213,750 |
| | 8/28/97 | $15.42 | 240,000 |
| | 7/1/98 | $20.08 | 2,400,000 |
| | 6/6/00 | $14.06 | 150,000 |
| | 7/1/03 | $18.35 | 350,000 |
| Hanaka | 9/23/94 | $19.75 | 379,808 |
| Wilson | 9/23/94 | $19.75 | 58,500 |
| Pepi | 9/23/94 | $19.75 | 37,500 |
| Vassalluzzo | 9/23/94 | $19.75 | 37,500 |
| | 8/28/97 | $15.42 | 52,500 |
| | 7/1/98 | $20.08 | 585,000 |
| | 6/6/00 | $14.06 | 155,000 |
| | 7/1/03 | $18.35 | 100,000 |
| Mahoney | 8/28/97 | $15.42 | 82,500 |
| | 7/1/98 | $20.08 | 585,000 |
| | 6/6/00 | $14.06 | 105,000 |
| | 7/1/03 | $18.35 | 100,000 |
| Sargent | 8/28/97 | $15.42 | 82,500 |
| | 7/1/98 | $20.08 | 585,000 |
| | 6/6/00 | $14.06 | 187,500 |
| | 7/1/03 | $18.35 | 350,000 |
| | 12/4/01 | $17.40 | 750,000 |
| Bingleman | 7/1/98 | $20.08 | 450,000 |
| Hoyt | 6/6/00 | $14.06 | 37,500 |
| Anderson | 7/1/03 | $18.35 | 120,000 |

82.     Pursuant to the terms of the Company's shareholder-approved stock option plans, the exercise price of options must be no less than the fair market value of Staples stock on the date of grant.

83.     Pursuant to APB 25 of the Federal Accounting Standards Board, if the market price on the date of the grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

84.     In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just before a substantial rise in Staples' stock price, as demonstrated in the following charts:

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days After Grant | % Rise in Stock Price |
|---|---|---|---|
| 9/23/94 | $19.75# | $22.83* | 15.6% |
| 8/28/97 | $15.42# | $17.33* | 12.4% |
| 7/1/98 | $20.08# | $21.08* | 5.0% |
| 6/6/00 | $14.06# | $17.69 | 25.8% |
| 12/4/01 | $17.40 | $18.30 | 5.2% |
| 7/1/03 | $18.35# | $19.66 | 7.1% |

\#      Denotes lowest closing price of the month or fiscal quarter of grant
*      Denotes price adjusted for stock splits











**Staples, Inc.**
**Stock Option Grants - December 2001**



**Staples, Inc.**
**Stock Option Grants - July 2003**

85.     The reason for the extraordinary pattern set forth in the preceding paragraphs and charts is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Officer Defendants, the Compensation Committee Defendants, acting with the authority and on behalf of the Staples Board, improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Staples stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Individual Defendants set forth above and improperly reduced the amounts those defendants had to pay the Company upon exercise of the options.

86.     As a result of the improper backdating of stock options, and as more fully discussed herein, the Company, with the knowledge, approval, and participation of each of the Individual Defendants;

a.      violated the terms of the Company's shareholder-approved stock option plans;

b.      violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

c.      violated Section 162(m) of the Tax Code by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans;

d.      produced and disseminated to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants; and

e.      damaged or otherwise harmed Staples.

**Defendants' Dissemination of False Financial Statements**

87.     From 1994 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating:

   a.      disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants; and

   b.      filed with the SEC Form 4 filings that falsely reported the dates of stock option grants to certain of the Individual Defendants.

88.     The Individual Defendants either caused, approved or otherwise permitted the filing of Form 10-K's and Form 10-Q's, as well as amendments, with the SEC, as noted below that presented the Company's financial results in violation of GAAP and were otherwise false and misleading, due to the improper accounting for backdated options and the failure to properly disclose the same.

89.     Staples' financial results for the fiscal years ended in 1995 through 2006 were reported in Annual Reports on Form 10-K and/or Form 10-K405 filed with the SEC and distributed to Staples shareholders.  Defendants Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarity, Nakasone, Trust and Walsh, with the knowledge that the financial statements were false and misleading, each signed at least one Form 10-K and/or Form 10-K405 filed with the SEC between 1995 and 2006, as follows:

| Defendant Signatory | Form 10-K or Form 10K-405 for the Fiscal Years Ended In |
| --- | --- |
| Stemberg | 1995-2005 |
| Hanaka | 1997 |
| Wilson | 1995-1996 |
| Sargent | 2000-2006 |
| Hickey | 2000-2002 |
| Mahoney | 1997-2006 |

| Mayerson | 1998-1999 |
|----------|-----------|
| Nachbor | 2004 |
| Anderson | 1998-2006 |
| Barnes | 2003-2005 |
| Blank | 2002-2006 |
| Burton | 1996-2006 |
| Moriarity | 1995-2006 |
| Nakasone | 1995, 1997-2006 |
| Trust | 1997-2006 |
| Walsh | 1995, 1997-2006 |

90.     Furthermore, in each of its Form 10-K405 and Form 10-K Annual Reports filed with the SEC from 1995 to 2004, the Individual Defendants caused and/or allowed the Company to represent falsely that it followed APB 25 to account for stock-based compensation.  For example, in the Company's Form 10-K filed with the SEC on March 20, 2001, Staples stated:

> ***Staples elected to follow Accounting Principles Board Opinion No. 25***, "Accounting for Stock Issued to Employees" ("APB 25") and related interpretations in accounting for its employee stock options because, as discussed below, the alternative fair value accounting provided for under FASB Statement No. 123, "Accounting for Stock-Based Compensation" ("FAS 123") requires use of option valuation models that were not developed for use in valuing employee stock options.  ***Under APB 25, since the exercise price of Staples' employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.*** (Emphasis added).

## False CEO and CFO Certifications

91.     In connection with the filing of certain Annual Reports on Form 10-K during the relevant period, Defendants Sargent and Mahoney filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that each Annual Report on Form 10-K "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in

all material respects, the financial condition and results of operations of the Company." Defendants Sargent and Mahoney signed the following Certifications:

a.   for the Form 10-K for the fiscal year ended February 1, 2003, filed with the SEC on March 5, 2003;

b.   for the Form 10-K for the fiscal year ended January 31, 2004, filed with the SEC on March 4, 2004;

c.   for the Form 10-K for the fiscal year ended January 29, 2005, filed with the SEC on February 24, 2005; and

d.   for the Form 10-K for the fiscal year ended January 28, 2006, filed with the SEC on February 28, 2006.

**Material Consequences of Backdating Violations and Related False Accounting**

92.    As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Staples to violate GAAP, SEC regulations and IRS rules and regulations.

93.    Staples' financial results for 1994 through 2006 were included in reports filed with the SEC and in other shareholder reports.  In these reports, the Individual Defendants represented that Staples' financial results were presented in a fair manner and in accordance with GAAP.

94.    The Individual Defendants' representations were materially false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

95.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at the

particular time.   Regulation S-X, to which the Company is subject as a registrant under the
Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC,
which are not prepared in compliance with GAAP, are presumed to be misleading and
inaccurate.

96.     During the relevant period, the Individual Defendants caused the Company to
understate its compensation expenses by not properly accounting for its stock options under
GAAP and thus overstated the Company's net earnings.

97.     Staples' false and misleading relevant period statements and omissions regarding
its accounting were material, particularly in light of SEC guidance on materiality.   SEC Staff
Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of
materiality.   Among other items, SAB Topic 1M says:   "A matter is 'material' if there is a
substantial likelihood that a reasonable person would consider it important."   It also stresses that
materiality requires qualitative, as well as quantitative, considerations.   For example, if a known
misstatement would cause a significant market reaction that reaction should be taken into
account in determining the materiality of the misstatement.

98.     SAB Topic 1M further states:

> Among the considerations that may well render material a
> quantitatively small misstatement of a financial statement item are –
>
> *      *      *
>
> whether the misstatement masks a change in earnings or other
> trends
>
> whether the misstatement hides a failure to meet analysts'
> consensus expectations for the enterprise
>
> *      *      *

Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

99.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

100.    Staples' misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**Staples' Financial Statements Violated Fundamental Concepts of GAAP**

101.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

> (f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶¶95, 97).

102.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

103.    The chart below illustrates Staples' false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year Ended | Reported Net Income (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| January 28, 1995 | $72.071 million | $0.21 |
| February 3, 1996 | $108.428 million | $0.28 |
| February 1, 1997 | $144.742 million | $0.36 |
| January 31, 1998 | $167.914 million | $0.41 |
| January 30, 1999 | $185.370 million | $0.43 |
| January 29, 2000 | $314.988 million | $0.42 |
| February 3, 2001 | $59.712 million | - |
| February 2, 2002 | $264.970 million | $0.40 |
| February 1, 2003 | $446.100 million | $0.96 |
| January 31, 2004 | $490.211 million | $1.01 |

| January 29, 2005 | $708.388 million | $0.95 |
| January 28, 2006 | $834.409 million | $1.14 |

104.    Meanwhile, the Individual Defendants were causing the Company to grant them millions of backdated stock options.  The Company's executives received a significant number of backdated stock options as compensation during the relevant period.

### DEFENDANTS ACTIVELY CONCEALED THEIR ILLEGAL BACKDATING PRACTICES

105.    At times relevant hereto, defendants took affirmative steps to conceal their backdating actions by authorizing or otherwise causing the Company to issue proxy statements, Form 3s, Form 4s, Form 5s, Form 10-Qs, Form 10-Ks, and other SEC filings and public statements that contained false disclosures concerning the grant dates of options granted to Staples insiders.  These false disclosures prevented Plaintiff from recognizing that Staples insiders were illegally backdating their stock options grants.

106.    From 1995 to 2004, the Company, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper stock option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that options were granted to the Individual Defendants at the "fair market value of Staples common stock on the date of grant," as follows:

>    a.    Staples' proxy statement filed with the SEC on May 26, 1995 falsely reported that stock options granted to Stemberg, Hanaka, Wilson, Pepi and Vassalluzzo were granted on September 23, 1994, and that the exercise price of these stock options was equal to "the fair market value per share of Common Stock on the date of grant;"

b.      Staples' proxy statement filed with the SEC on April 20, 1998 falsely reported that stock options granted to Stemberg, Mahoney, Sargent and Vassalluzzo were granted on August 28, 1997, and that the exercise price of these stock options was equal to "the fair market value per share of Common Stock on the date of grant;"

c.      Staples' proxy statement filed with the SEC on April 19, 1999 falsely reported that stock options granted to Stemberg, Mahoney, Sargent, Vassalluzzo and Bingleman were granted on July 1, 1998, and that the exercise price of these stock options was equal to "the fair market value per share of Common Stock on the date of grant;"

d.      Staples' proxy statement filed with the SEC on May 9, 2001 falsely reported that stock options granted to Stemberg, Mahoney, Sargent, Vassalluzzo and Hoyt were granted on June 6, 2000, and that the exercise price of these stock options was equal to "the fair market value per share of Staples RD stock on the date of grant, based on the last reported sales price on NASDAQ;"

e.      Staples' proxy statement filed with the SEC on May 3, 2002 falsely reported that stock options granted to Sargent were granted on December 4, 2001, and that the exercise price of these stock options was equal to "the fair market value per share of Staples common stock on the date of grant;" and

f.      Staples' proxy statement filed with the SEC on May 5, 2004 falsely reported that stock options granted to Stemberg, Mahoney, Sargent, Vassalluzzo and Anderson were granted on July 1, 2003, and that the exercise price of these stock options was equal to "the fair market value per share of Staples common stock on the date of grant."

107.    Moreover, in the Compensation Committee Reports on Executive Compensation in the Company's proxy statements filed between 1995 and 2004, Staples falsely stated that its executive compensation program was designed to "retain and reward executives who are responsible for leading Staples in achieving its business objectives," when, in fact, the executives received instant profits regardless of whether the Company achieved its objectives.

108.    From 1997 to 2006, Staples, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper

stock option backdating, filed with the SEC Form 4s that falsely reported the dates of Staples stock option grants to the Individual Defendants.

109.    Indeed, prior to the March 18, 2006 *The Wall Street Journal* article, titled "The Perfect Payday," the public consensus was that favorable option timing could be largely explained by an insider's ability to predict that favorable company news was coming and that insiders were timing grants to take advantage of it.  This consensus was not challenged until academic research – that included examinations of thousands of companies – revealed that it was likely that grant dates had been filled in retroactively.

110.    Thus, due to the public consensus that favorable option timing could be explained away by an insiders' ability to predict the stock price and defendants' active concealment of their backdating practices, shareholders were prevented from recognizing the validity of the claims prior to the March 18, 2006 *The Wall Street Journal* article.  Even after that article was published, there were insufficient warnings that implicated Staples in the backdating scandal. The first public disclosure of backdating specifically at Staples did not occur until November 14, 2006.

111.    Plaintiff's ignorance of the Individual Defendants' illegal backdating practices was not attributable to a lack of due diligence.  It would be unreasonable to expect any shareholder, including Plaintiff, to undertake costly and extensive academic research and statistical analysis when Defendants' false public statements indicated that stock options were being properly granted.  In any case, Plaintiff was entitled to rely upon the truthfulness of the disclosures contained within Staples' public statements and SEC filings.

112.    After the November 14, 2006 public disclosure of backdating practices at Staples, Plaintiff conducted, with the assistance of counsel, an investigation of Staples' prior option

grants, discovered numerous suspicious grants dated at extremely favorable exercise prices and brought this action on behalf of Staples to preserve the Company's claims against the wrongdoers responsible for illegal backdating.

## INDIVIDUAL DEFENDANTS' ILLEGAL INSIDER SELLING

113.     During the relevant period, certain of the Individual Defendants (collectively, the "Insider Selling Defendants"), while in possession of materially adverse non-profit information regarding the backdating of stock options and the false financial statements resulting therefrom, sold their own Staples stock, for hundreds of millions of dollars, as set forth below, including a significant portion that was obtained through the exercise of improperly backdated stock options:

| Defendant | Dates of Sales | Proceeds |
|-----------|----------------|----------|
| Stemberg | 12/12/96 - 06/02/05 | $189,067,230.48 |
| Vassalluzzo | 07/09/98 - 03/10/98 | $25,475,477.36 |
| Sargent | 07/09/98 - 11/16/06 | $64,072,361.61 |
| Hickey | 05/18/00 - 03/07/02 | $774,827.38 |
| Mahoney | 07/09/98 - 03/07/06 | $34,384,497.00 |
| Hoyt | 07/09/98 - 05/23/02 | $6,861,358.10 |
| Bingleman | 07/24/98 - 06/19/00 | $9,030,126.37 |
| Mayerson | 05/12/98 - 06/16/99 | $1,074,312.00 |
| Anderson | 03/28/01 - 03/01/06 | $25,140,636.69 |
| Burton | 03/29/01 - 07/01/04 | $5,095,795.67 |
| Moriarty | 07/24/98 - 03/29/06 | $9,719,289.86 |
| Nakasone | 12/02/97 - 11/26/04 | $10,612,647.29 |
| Trust | 08/07/98 - 12/08/06 | $11,849,238.50 |
| Walsh | 04/16/98 - 05/23/06 | $5,454,934.25 |
| **TOTAL** | **12/12/99 - 12/08/06** | **$398,612,732.56** |

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

114.     The Officer Defendants breached their fiduciary duties by:

a.      colluding with the Compensation Committee Defendants to backdate stock option grants;

b.      colluding with the Audit Committee Defendants to violate GAAP;

c.      colluding with the other Individual defendants to produce and disseminate to Staples shareholders and the market false financial statements that

improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.      colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

115.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

116.    The Compensation Committee Defendants breached their fiduciary duties by:

a.      colluding with the Officer Defendants to backdate stock option grants;

b.      colluding with the Officer Defendants and Audit Committee Defendants to violate GAAP;

c.      colluding with the other Individual Defendants to produce the disseminate to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.      colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

117.    The Compensation Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

118.    The Audit Committee Defendants breached their fiduciary duties by:

a.      colluding with the Officer Defendants to violate GAAP;

b.      colluding with the other Individual Defendants to produce and disseminate to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

c.      colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

119.    The Audit Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.   Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

120.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

121.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties and unjust enrichment.

122.    Plaintiff is an owner of Staples common stock and was an owner of Staples common stock during the relevant period and continues to retain its ownership of Staples common stock.

123.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

124.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Staples Board of Directors to institute this action against the Individual Defendants.   Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

125.    The Board currently consists of ten directors: Defendants Sargent, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Trust, and Walsh and Director Gary L. Crittendon. Each of the Defendants is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute the action for the following reasons, among others:

> a.      Sargent and Anderson, because, among other things, they are directly interested in the improperly backdated stock option grants complained of, and Sargent, Anderson, Burton, Moriarty, Nakasone, Trust and Walsh because they engaged in illegal insider selling in violation of their duty to abstain or disclose, including the exercise and sale of backdated options;

b.      Barnes, Blank, Nakasone and Trust because as members of the Compensation Committee they directly participated in and approved the improper backdating of stock options, as alleged herein, and are substantially likely to be held liable for breaching their fiduciary duties. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Barnes, Blank, Nakasone and Trust have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

c.      Anderson, Burton and Walsh because as members of the Audit Committee they directly participated in and approved the Company's violations of GAAP, as alleged herein, and are substantially likely to be held liable for breaching their fiduciary duties. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Anderson, Burton and Walsh have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

d.      All of the current directors, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein, and are substantially likely to be held liable for breaching their fiduciary duties. Moreover, by colluding with the Officer Defendants and others, as alleged herein, all of the current directors have demonstrated that they are unable or unwilling to act independently of the Officer Defendants.

126.    The Compensation Committee of the Board is specifically responsible under its charter for reviewing and approving the Company's compensation philosophy and its executive compensation programs, plans and awards. This responsibility, although held by the Board, is delegated to the Compensation Committee. The Compensation Committee is currently comprised of defendants Barnes and Blank. Defendant Barnes has been a member of the Compensation Committee for at least 3 years while Defendant Blank has been a member for at least 5 years. Defendant Nakasone served as member of the Compensation Committee for at least 8 years, including five years as Chairman, while Defendant Trust served as a member for at least 9 years, including four years as Chairman. These Defendants were responsible as members of the Compensation Committee to review and approve stock options granted to Staples insiders during their respective tenures on the Committee. Clearly, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock-option grants. Accordingly, there is a reasonable doubt that Defendants Barnes, Blank, Nakasone and Trust are disinterested because

they face a sufficiently substantial likelihood of liability for their breaches of fiduciary duty to Staples.  The Compensation Committee's decision to approve the options was not the product of valid business judgment.  Thus, demand is futile as to Compensation Committee members Defendants Barnes, Blank, Nakasone and Trust.

127.    The Audit Committee of the Board is responsible by its charter for: (i) reviewing and discussing the Company's financial statements and disclosures; (ii) considering whether to recommend to the Board that the Company's audited financial statements be including in the Company's Annual Report on Form 10-K; (iii) discussing with the Company's management and auditor the Company's quarterly financial statements; (iv) receiving and reviewing the reports of the CEO and CFO required by Rule 13a-14 of the Securities Exchange Act and (v) overseeing the Company's internal accounting controls and the Company's disclosure controls and procedures.  These responsibilities, although held by the Board, are delegated to the Audit Committee. The Audit Committee is currently comprised of Defendants Burton and Walsh. Defendant Burton has been a member of the Audit Committee for at least 12 years.  Defendant Walsh has similarly been a member for at least 12 years, including at least 9 years as Chairman. Defendant Anderson served as a member of the Audit Committee for at least 4 years, including 3 years as Chairman.  These Defendants were responsible as members of the Audit Committee for insuring that Staples' internal controls were adequate.  Staples' internal controls, however, were deficient as evidenced by its insiders' improper backdating of stock-option grants.  As a result of the improper backdating of stock options, the Company's financials were rendered inaccurate because those financials did not account for the true amount of compensation being granted to Staples' insiders.  Accordingly, there is a reasonable doubt that defendants Anderson, Burton and Walsh are disinterested because they face a sufficiently substantial likelihood of liability for their breaches of fiduciary duties owed to Staples.  Thus, demand is futile as to Audit Committee member defendants Anderson, Burton and Walsh.

128.    Defendant Burton, by her specialized financial expertise, was in a unique position to understand the business of Staples, as well as its finances, markets, and present and future

business prospects. Burton has an MBA from the University of Chicago and has previously served in the position of CEO at several other companies, including The Home Depot, Inc. (which has also now admitted to having had improprieties with its stock option granting practices).  Burton, because of her unique qualifications, had a heightened duty to ensure the accuracy and fairness of Staples' financials during at least 12 years on the Audit Committee. Nonetheless, defendant Burton breached her duties by causing or allowing the improper financials described herein. As a result of this Defendant's breach of her duties, any demand upon her is futile.

129.     Defendant Walsh, by his specialized financial expertise, was in a unique position to understand the business of Staples, as well as its finances, markets, and present and future business prospects. Walsh has an MBA from Boston University (with honors) and has previously served in the position of CEO of several other companies, including Clareon Corporation and Wright Express Corporation.  Walsh, because of his unique qualifications, had a heightened duty to ensure the accuracy and fairness of Staples' reported compensation expenses during at least 12 years on the Audit Committee.  Nonetheless, Defendant Walsh breached his duties by causing or allowing the improper financials described herein. As a result of this Defendant's breach of his duties, any demand upon him is futile.

130.     Each of the defendants knew the adverse, non-public information regarding the improper accounting as a result of their access to and review of internal corporate documents, attendance at Board meetings, and conversations and connections with other corporate officers, employees and directors.

131.     Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.  It was not, and could not be, an exercise of good faith business judgment for Defendants to cause Staples to: violate its own stock option plans; issue false financial statements; issue false proxy statements; cause the Company to file false tax returns; subject the Company to owe back-taxes and penalties to the IRS; subject the Company to potential federal securities law prosecutions; and

pay extra compensation to its officers and directors through the manipulative and concealed scheme asserted herein.

132.    Here, where the board consists of experienced executives with years of financial expertise, there is little doubt as to the Board members' knowledge of impropriety.  The odds of Staples stock price increasing exponentially almost each time in the two week period following stock option grants, and experienced industry veterans failing to recognize the amazing and alarming pattern, are long.  A *Wall Street Journal* analysis following options grants made by another company under similar circumstances, suggested that the odds of the fortuitous stock price increase following each grant was extraordinarily remote–around one in 300 billion, while the odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

133.    Given these odds, it defies reason that the Board members with years of financial experience and training would fail to recognize this pattern year after year in grants not only given to their associates, but to themselves as well.  Where illegal conduct occurs over a period of years and the Board is not only is aware of but participates in it for a substantial period of time without taking any action, demand futility is presumed.  *See In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003) (in finding demand excused court noted that given the extensive trail concerning the violations of federal regulations and inferred awareness of the problems, the facts supported a reasonable assumption that there was a sustained and systematic failure of the board to exercise oversight in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith; the court held that ***"continuing violations of federal regulations over a period of six years cannot be minimized"***) (emphasis added); *In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2006) ("[i]f true, plaintiffs allegations that the Committee failed to exercise appropriate attention to potentially illegal corporate activities would constitute a breach of loyalty, subjecting [listing several defendants] to a substantial likelihood of liability.  Thus, plaintiffs' allegations raise a reasonable

doubt that these director-Committee members were disinterested and capable objectively deciding whether or not to prosecute this litigation on the corporation's behalf"); *Ryan v. Gifford,* No. CIV.A. 2213-N, 2007 WL 416162, *9 (Del. Ch. Feb. 6, 2007) (finding that demand was excused where the plaintiff pointed to "specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures," and further noting that directors of public corporations "should not be surprised to find that lying to shareholders is inconsistent with loyalty, which necessarily requires good faith").

134.    The board is further conflicted because any serious investigation and/or finding of impropriety by the board would negatively affect the Company's earnings in multiple ways.

135.    Defendants are therefore not disinterested and will not commence any action seeking redress against themselves or others since doing so could harm their positions within and remuneration from the Company.

136.    Additionally, and without prejudice to the foregoing, no demand upon the Board is required with respect to claims asserted arising from the filing or issuance of misleading proxy statements by defendants, as more fully discussed herein.

## FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duties

137.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

138.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

139.    As alleged in detail herein, the Officer Defendants breached their fiduciary duties by:

       a.    colluding with the Compensation Committee Defendants to backdate stock option grants;

      b.      colluding with the Audit Committee Defendants to violate GAAP and Section 162(m);

      c.      colluding with the other Individual Defendants to produce and disseminate to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

      d.      colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

140.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

141.    As alleged in detail herein, the Compensation Committee Defendants breached their fiduciary duties by:

      a.      colluding with the Officer Defendants to backdate stock option grants;

      b.      colluding with the Audit Committee Defendants to violate GAAP and Section 162(m);

      c.      colluding with the other Individual Defendants to produce and disseminate to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed  the improper backdating of stock options; and

      d.      colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

142.    The Compensation Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

143.    As alleged in detail herein, the Audit Committee Defendants breached their fiduciary duties by:

      a.      colluding with the Officer Defendants to violate GAAP and Section 162(m);

      b.      colluding with the other Individual Defendants to produce and disseminate to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    c.     colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

144.    The Audit Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

145.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for
### Violations of §14(a) of the Exchange Act

146.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

147.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

148.    Staples Definitive Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the defendants were causing Staples to engage in an option backdating scheme, a fact of which the defendants were aware and participated in from at least 1994 and further misrepresented that Staples options were granted to Company executives and directors at an exercise price equal to the market price of Staples stock on the date the stock options were granted.  Certain of the Proxy Statements were further false and misleading with respect to their representations concerning the tax implications of the stock option grants.

149.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

150.    The misrepresentations and omissions in the Proxy Statements were material to shareholders in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock options backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

151.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

### THIRD CAUSE OF ACTION

**Against All Defendants for Breach of Fiduciary Duties**
**Relating to the Filing of False Financial Statements with the SEC**

152.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

153.    Each of the Individual Defendants intentionally or recklessly employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company.

154.    The Company relied upon the Individual Defendants' fraud in granting certain of the other Individual Defendants options to purchase shares of Staples common stock.

155.    As a direct and proximate result of the Individual Defendants' fraud the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## FOURTH CAUSE OF ACTION

### Against Defendants Stemberg, Hanaka, Wilson, Pepi, Vassalluzzo, Mahoney, Sargent, Bingleman, Hoyt and Anderson for Unjust Enrichment

156.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

157.    These Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

158.    To remedy the Defendants' unjust enrichment, this Honorable Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## FIFTH CAUSE OF ACTION

### Against All Defendants for Abuse of Control

159.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

160.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over Staples, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at the Company.  As a part of this scheme, defendants actively made and/or participated in the making of, or aided and abetted the making of, misrepresentations regarding Staples.

161.    Defendants' conduct constituted an abuse of their ability to control and influence Staples.

162.    By reason of the foregoing, the Company has been damaged.

## SIXTH CAUSE OF ACTION

### Against All Defendants for Gross Mismanagement

163.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

164.    Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure control of Staples.

165.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Staples in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

166.    During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Staples to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Staples, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged Staples.

167.    By reason of the foregoing, the Company has been damaged.

## SEVENTH CAUSE OF ACTION

### Against All Defendants for Constructive Fraud

168.    Plaintiff incorporates all preceding and subsequent paragraphs as if fully set forth herein.

169.    As corporate fiduciaries, Defendants owed to Staples and its shareholders a duty of candor and full accurate disclosure regarding the true state of Staples' business and assets and their conduct with regard thereto.

170.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Staples' shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Staples.  Thus, they have committed constructive fraud and violated their duty of candor.

171.    By reason of the foregoing, the Company has been damaged.

## EIGHT CAUSE OF ACTION

### Against All Defendants for Corporate Waste

172.    Plaintiff incorporates all preceding and subsequent paragraphs as if fully set forth herein.

173.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused Staples to waste valuable corporate assets.

174.    As a result of Defendants' corporate waste, they are liable to the Company.

## NINTH CAUSE OF ACTION

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

175.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

176.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Staples common stock on the basis of such information.

177.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Staples common stock.

178.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated because of the undisclosed stock option and other related compensation expenses.  The Insider Selling Defendants' sales of Staples common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

179.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive that on any profits the Insider Selling Defendants obtained thereby.

## TENTH CAUSE OF ACTION

**Against Defendants Stemberg, Hanaka, Wilson, Pepi, Vassalluzzo, Mahoney, Sargent, Bingleman, Hoyt and Anderson for Rescission**

180.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

181.   As a result of the acts alleged herein, the stock option contracts between these Defendants and Staples entered into during the relevant period were obtained through Defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid because Defendants authorized these options in breach of the terms of the publicly filed contracts regarding the Defendants' employment agreements and the Company's stock option plans.

182.   All contracts which provide for stock option grants between the these Defendants and Staples and were entered into during times relevant hereto should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## ELEVENTH CAUSE OF ACTION

### Against All Defendants for Constructive Trust

183.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

184.    As a result of the acts alleged herein, the Individual Defendants authorized the grant of backdated or otherwise manipulated equity based compensation to themselves and other Staples insiders.  In effect, these backdated options and other manipulated equity or incentive based compensation constitutes illegal compensation in violation of Staples' stock option plans and other compensation policies.

185.    The Company has a right for the return of this compensation because it was illegally authorized by the Individual Defendants and paid out of the Company's assets.

186.    The Individual Defendants and other Staples insiders profited from the illegally backdated options by wrongful acts.

187.    Accordingly, Plaintiff seeks a declaratory judgment that the illicit stock options, and all proceeds derived from exercise thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

## TWELFTH CAUSE OF ACTION

### Against All Defendants for Violations of § 10(b) and Rule 10b-5 of the Securities and Exchange Act

188.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

189.    Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to

defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the Company.

190.    The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

191.    The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

192.    The Company relied upon the Individual Defendants' fraud in granting the Individual Defendants options to purchase shares of the Company's common stock, as alleged herein.

193.    As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, as alleged herein.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants to not participate therein or benefit thereby;

B.     Directing all Defendants to account for all damages cause by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.      Directing Staples to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

   i.      a proposal to strengthen the Staples Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

   ii.     appropriately test and then strengthen the internal audit and control function;

   iii.    rotate independent auditing firms ever five years;

   iv.     control and limit insider stock selling and the terms and timing of stock option grants; and

   v.      reform executive compensation.

D.      Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.      Awarding punitive damages;

F.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees;

G.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including an accounting, rescission, attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Staples has an effective remedy; and

H.      Granting such other and further relief as this Court may deem just and proper.

DATED: March  7 , 2007                          Respectfully submitted,


                                                -S-
                                    _____
                                    Glen DeValerio
                                    Jeffrey C. Block
                                    **BERMAN DEVALERIO PEASE
                                    TABACCO BURT & PUCILLO**
                                    One Liberty Square
                                    Boston, MA 02109
                                    (617) 542-8300 (telephone)
                                    (617) 542-1194 (facsimile)

                                    And

                                    Daniel E. Bacine
                                    Jeffrey W. Golan
                                    Chad A. Carder
                                    **BARRACK, RODOS & BACINE**
                                    3300 Two Commerce Square
                                    2001 Market Street
                                    Philadelphia, PA 19103
                                    (215) 963-0600 (telephone)
                                    (215) 963-0838 (facsimile)

                                    Counsel for Plaintiff
                                    Laborers' International Union of North
                                    America National (Industrial) Pension Fund